# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| WALLACE ARNOLD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 13-cv-00613 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| VISIONTEK PRODUCTS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Wallace Arnold claims that his former employer, Defendant VisionTek Products, LLC ("VisionTek"), subjected him to a hostile work environment because of his race and then retaliated against him for complaining about the mistreatment by terminating his employment, in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000 *et seq*.[1] Specifically, Arnold alleges that his supervisor repeatedly threatened him with unwarranted disciplinary action, assigned him impossible tasks to complete, and forced him to use only the back door to enter and exit VisionTek's facility—all because he is black. Arnold further alleges that VisionTek terminated his employment after he complained to his supervisor that he was being treated differently on account of his race and that his civil rights were being violated. Now before the Court is VisionTek's motion for summary judgment. (Dkt. No. 77.) For the reasons stated below, the motion is granted.

---

[1] Title VII prohibits race discrimination in the employment context, while § 1981 prohibits race discrimination in the making and enforcing of contracts. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). Both statutes also prohibit retaliation against a person for opposing discriminatory practices that the statutes proscribe. *Id*. Discrimination claims under both Title VII and § 1981 are analyzed in the same manner. *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 338 (7th Cir. 2002).

## BACKGROUND

The following facts are gleaned from the parties' summary judgment filings.[2] As one would expect, many of the facts are disputed. For purposes of VisionTek's summary judgment motion, the Court considers the record in the light most favorable to Arnold as the non-moving party, resolving all evidentiary conflicts in his favor and according him the benefit of all reasonable inferences that may be drawn from the record. *See Coleman v. Donahoe,* 667 F.3d 835, 842 (7th Cir. 2012).

Arnold was hired by Hartford Computer Group—VisionTek's predecessor company—in 2002. (Def.'s Resp. to Pl.'s Additional Stmt. of Facts ("DRPASF") ¶ 1, Dkt. No. 90.) In 2006, VisionTek became a separate company and Arnold began working there. (*Id.*) VisionTek manufactures and sells computer products, such as graphics cards, memory cards, and power supplies. (Pl.'s Resp. to Def.'s Stmt. of Undisputed Facts ("PRDSUF") ¶ 2, Dkt. No. 83.) During the relevant time period, Arnold worked as part of the production team at VisionTek's warehouse facility in East Dundee, Illinois. (*Id.* ¶¶ 4, 13.) He was primarily responsible for packing boxes of products to be shipped to customers. (*Id.* ¶ 21.) The production team, which in addition to Arnold consisted of Bennie Gipson, Edwin Mangosing, Sanjiv Amin, and Jose Torres, was supervised by Wendell Calip, Vice President of Operations and Information Technology at VisionTek. (*Id.* ¶¶ 12–14.) Arnold was ultimately terminated from VisionTek on August 3, 2012. (DRPASF ¶ 2, Dkt. No. 90.)

According to VisionTek, Arnold was terminated as a result of a pattern of misbehavior and poor performance that began in or around 2011. (PRDSUF ¶ 36, Dkt. No. 83.) To support its

---

[2] These include the parties' submissions under Local Rule 56.1, which "is designed, in part, to aid the district court, which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information, in determining whether a trial is necessary." *Delapaz v. Richardson,* 634 F.3d 895, 899 (7th Cir. 2011) (internal quotation marks omitted).

version of the events leading to Arnold's firing, VisionTek points to a February 14, 2011 email

from Michael Innes, the company's President and Chief Operating Officer, identifying a number

of examples of Arnold's "unprofessional behavior and poor attitude," each of which was

corroborated during discovery in this litigation by deposition testimony from Arnold's co-

workers. (*Id.* ¶¶ 8, 37; Def.'s Stmt. of Undisputed Facts ("DSUF") Ex. N, Dkt. No. 78-19.)[3] The

email, which was sent to Calip and Andra Morgan, VisionTek's Vice President of Finance and

Director of Human Resources, references an altercation between Arnold and a temporary worker;

Arnold's propositioning of Edna Garcia, an employee of Encore, a company that shares

VisionTek's warehouse space at the East Dundee location; and a confrontation between Arnold

and Jeff Anderson,[4] another Encore employee. (PRDSUF ¶¶ 10, 37, 44, Dkt. No. 83.) The email

also mentions an incident in which Arnold was seen surrounded by police at a bus stop being

questioned for inappropriate public behavior. (*Id.* ¶ 37.)

With respect to the first altercation described in the email, Arnold purportedly advised a

temp—who was assigned to assist and reported to Gipson—of a safety issue. (*Id.* ¶¶ 38–39.) The

temp "snapped" and Arnold walked away. (*Id.* ¶¶ 39, 42.) However, Arnold approached the temp

after work because the earlier confrontation "kept eating at [him]," and the situation escalated

until Calip intervened. (*Id.*) According to Gipson, the altercation occurred because Arnold was

improperly attempting to instruct the temp on how to perform his job. (*Id.* ¶ 42.)

As to Arnold's interactions with the female Encore employee, he offered to give her gas

money or take her out to lunch after she gave him a ride. (*Id.* ¶ 44.) Arnold's co-workers testified

---

[3] Innes testified that he did not have personal knowledge of the events described in the email; rather, the content of the email was based on information relayed to him by Calip. (DSUF Ex. D-1 at 139-41, Dkt. No. 78-5.)

[4] Innes's email refers to a Jeff Hoeft but, despite some confusion in the record, it is undisputed that the incident actually involved Jeff Anderson. (DRPASF ¶ 34, Dkt. No. 90.)

that he brought Garcia food, flowers, and other presents on numerous occasions and that she was uncomfortable with Arnold's advances. (*Id.* ¶¶ 46–48.) When Arnold observed Anderson speaking with Garcia, he assumed Anderson was telling her bad things about him. (*Id.* ¶¶ 49–50.) So Arnold responded by threatening Anderson, who he viewed as competition for Garcia's attention. (*Id.* ¶¶ 49–51.) After discussing the situation with Calip about the situation, Arnold left work angry. (*Id.* ¶ 37.) The next day, he showed up to work two hours late without calling to notify VisionTek of his late arrival. (*Id.*)

After Innes sent the February 14, 2011 email discussed above, Arnold was issued a written disciplinary warning notice regarding his behavior towards Anderson. (*Id.* ¶ 53.) The notice, dated February 16, 2011 and signed by Arnold, states that he made "negative verbal comments toward another employee on the work floor." (*Id.*; DSUF Ex. O, Dkt. No 78-20.) The notice also indicates that Arnold was given a "verbal warning that these actions cannot happen in the work place" and that he would face dismissal if he failed to correct his behavior. (*Id.*) Arnold received and signed a separate disciplinary warning notice, also dated February 16, 2011, for showing up to work late and failing to call. (PRDSUF ¶ 54, Dkt. No. 83; DSUF Ex. P, Dkt. No. 78-21.)

Then, beginning in or around early 2012, Arnold, who had become active with the Occupy Wall Street movement and in protesting the killing of Trayvon Martin, began making and displaying political picket signs at work. (PRDSUF ¶ 26, Dkt. No. 83.) He made the signs using VisionTek materials—including boxes, two-by-four posts, and markers—during normal business hours when he should have been working. (*Id.*) As Arnold admits, the language on the signs was vulgar and inappropriate for the workplace. (*Id.* ¶ 28.) For instance, Arnold himself testified at his deposition that one sign read "fuck America." (*Id.*) VisionTek asserts—and Gipson testified—that another sign read "F whitie," or "fuck whites," although Arnold denies making signs with any

such language. (*Id.* ¶ 29.) Innes and Calip both saw and received complaints about signs containing inappropriate language, including a sign that was derogatory towards lawyers and bankers. (*Id.* ¶ 30.) VisionTek asserts that Arnold intentionally displayed the signs, such as by carrying the signs in a manner to be seen when he entered and exited the warehouse. (*Id.* ¶ 31.) Moreover, Arnold's construction of the signs while at work had a significant impact on his productivity and on his working relationships with the other members of the production team. (*Id.* ¶ 33.) His co-workers testified that he became a slower worker, which caused bottlenecks on the production line. (*Id.* ¶¶ 33–35.) They further testified that they had to pick up Arnold's slack and that they began to resent him because he was not working as hard as they were. (*Id.*)

On March 26, 2012, Calip issued Arnold a third disciplinary warning notice, this time regarding the signs. (*Id.* ¶ 27; DSUF Ex. Q, Dkt. No. 78-22.) The notice states as follows:

> [Calip] observed a sign that was being displayed in the production area that had vulgar language written on it. [Calip] asked [Arnold] to take down the sign[,] stating that it was inappropriate in the workplace. [Arnold] reacted by stating that [Calip was] violating his civil rights. [Calip] stated that the workplace is not a place to display such signage. [He] was worried that a customer [might] come through or another employee [might] be offended.

(*Id.*) The notice indicates that there had been at least one prior verbal discussion with Arnold regarding the signs. (*Id.*) It also warns that "[c]ompany property is not a place to solicit personal and/or political views with signage" and that if Arnold continued "to use the workplace as a political forum or audience for his views by displaying signage, he [might] be docked pay or even terminated from his position." (*Id.*)

Despite the warning, Arnold continued making signs and was terminated as a result. (PRDSUF ¶ 31, Dkt. No. 83.) Arnold's notice of employment separation states that he "fail[ed] to be a team member," "distan[ced] himself from [the] team[,] causing friction in [the] production

area," and "continued to work at [a] slow pace when [the team was] busy[,] causing bottlenecks during peak shipping hours." (*Id.* ¶¶ 2-3; DSUF Ex. M, Dkt. No. 78-18.)

Arnold, of course, tells a very different story. He claims that the "non-African-American" management of VisionTek discriminated against him by subjecting him to a hostile work environment. First, he asserts that Calip demeaned and humiliated him by forcing him to come and go from work only through the back door of the facility, singling him out from his co-workers. VisionTek contends that this assertion is rebutted by an August 25, 2010 email from Innes to all VisionTek employees, which states in relevant part that, "[s]tarting today all warehouse employees must leave & enter through the rear door[.]" (PRDSUF ¶ 68, Dkt. No. 83; DSUF Ex. R, Dkt. No. 78-23.) Arnold denies receiving the email or being aware of its contents and suggests that this purported policy was not uniformly enforced against all employees. (PRDSUF ¶ 68, Dkt. No. 83.) VisionTek points out that Gipson (who is also black), Magnosing, and Amin all testified that beginning in or around August 2010 and continuing through August 2012 (when Arnold was terminated), they exclusively entered and exited the warehouse facility through the rear door. (*Id.* ¶ 70.)

In response, Arnold maintains that "he was singled out for coming and going through the back door of the warehouse." (*Id.*) Arnold claims that for at least some period of time, he was the only employee required to use the back door, until, after product was stolen from the warehouse, all employees began using the rear entrance. (DRPSAF ¶ 35, Dkt. No. 90.) During his deposition, Arnold could not recall specific dates when this occurred, but he stated that it was after VisionTek discovered his protest signs that they made him use the back door. (DSUF Ex. A-2 at 184–85, 188–89, Dkt. No. 78-2.) He initially testified that he was singled out because he was carrying politically-motivated signs (*Id.* at 190.) He then stated that "it could be because I am black, too."

(*Id.*) Arnold claims that Gipson, who is also black, did not have to go through the back door. (*Id.*) However, as noted above, Gipson, Magnosing, and Amin all testified that during the relevant time period, they entered and exited the warehouse facility through the rear door. (PRDSUF ¶ 70, Dkt. No. 83.)

Arnold further claims that Calip gave him impossible tasks—which were not assigned to any other employees—and then chastised, reprimanded, and humiliated him for failing to complete them. VisionTek asserts that Arnold was unable to substantiate this claim during his deposition, failing to identify a single "impossible" task that Calip assigned to him or even any task that Calip would not have assigned to other members of the production team. (DRPSUF ¶ 72, Dkt. No. 83.)[5] Indeed, other members of the team testified that Arnold was actually given simpler assignments because he worked slowly. (*See id.* ¶¶ 73–74.) For example, Mangosing said that he was given more difficult assignments than Arnold, and that when he completed those assignments, he would then help Arnold complete his simpler tasks. (DSUF Ex. I at 116–17, Dkt. No. 78-14.) In addition, Gipson testified that Calip never yelled at or ridiculed Arnold for failing to complete an assignment on time. (DSUF Ex. H-2 at 160, Dkt. No. 78-13.) In response, Arnold simply states that "[a]ll employees were assigned tasks of varying difficulty at different times." (DRPSUF ¶¶ 73–74, Dkt. No. 83.)

Finally, Arnold claims that Calip threatened him with unwarranted disciplinary notices, threatened to keep a secret file on him, and harassed him by making statements such as "I will make life difficult for you." (DRPSAF ¶ 11, Dkt. No. 90.) In support, Arnold cites to his own

---

[5] When asked during his deposition to identify any impossible tasks Calip gave him, Arnold referred generally to bottlenecks on the production line—which he acknowledged could be experienced by other members of the production team, not just him—and rush orders, the volume of which was higher in the spring and summer of 2012, prior to Arnold's termination. (DSUF Ex. A-2 at 190-95, 272-73, Dkt. No. 78-2.) Arnold testified that the rush orders went to him specifically, but he also stated that the production team worked together and that, when he was on the production line, other members of the team might have stepped in to help. (*Id.* at 246–47, 272.)

deposition testimony. (*See id.*) He also points to the March 2012 disciplinary incident discussed above in connection with which he told Calip that he believed his civil rights were being violated. (*Id.* ¶ 21.) In addition, Arnold asserts that in July 2012, "following one of [ ] Calip's verbal harassments," he told Calip, "you wouldn't be doing this to me if I wasn't black." (*Id.* ¶ 37.)[6] VisionTek contends that there is no evidence, aside from Arnold's own deposition testimony, that he ever made that statement. (PRDSUF ¶¶ 59–65, Dkt. No. 83.) Calip does not recall Arnold making the statement and none of his co-workers heard it. (*Id.* ¶¶ 62–65.)[7] Arnold maintains that he made the statement directly to Calip (although he does not indicate what Calip's response was, if he had any), and claims that his termination was in direct retaliation for his complaints of discrimination. (*Id.* ¶ 62.) Therefore, according to Arnold, there was no causal connection between the disciplinary warning notices he received and his discharge. (*Id.* ¶ 24.) Indeed, Arnold takes issue with each of VisionTek's proffered reasons for his termination.

While Arnold does not completely repudiate the complaints about his behavior described in Innes's February 14, 2011 email and the deposition testimony, he does offer his own point of view. First, with respect to his altercation with the temp worker, Arnold denies that he was improperly attempting to instruct the worker how to perform his job; he contends that he was simply trying to give the temp worker safety advice. (*Id.* ¶¶ 37, 42.) Arnold asserts that the temp

---

[6] Arnold testified that during the July 2012 incident, Calip said something along the lines of, "[a]re you done with all of the protesting and all that marching and all this stuff[?]" (DSUF Ex. A-2 at 202, Dkt. No. 78-2; *see also id.* at 283–84.) Arnold could not recall whether Calip initiated the conversation because he had brought a sign to work that day. (*Id.* at 203.) Arnold testified that in response to Calip's question, he told Calip that he felt Calip was violating his "constitutional and civil rights" and that Calip would not be doing this to him if he were not black. (*Id.* at 204, 280.)

[7] The parties dispute whether Arnold's co-workers would have heard the statement if he in fact made it. VisionTek takes the position (supported by deposition testimony) that because of the physical layout of the production area and the location of Arnold's work station, his co-workers would have heard any such statement. (PRDSUF ¶¶ 63–65, Dkt. No. 83.) Arnold denies that his co-workers would have heard the conversation between him and Calip. (*Id.* ¶¶ 62–65.)

worker "snapped" at him during their initial confrontation and that, when he approached him after work that day, the situation escalated because the temp worker kept yelling and getting louder and louder. (*Id.* ¶ 39.)

Second, Arnold denies making any advances toward Garcia, the female Encore employee. (*Id.* ¶¶ 37, 44, 47.) Rather, after she gave him a ride to the bus stop, he offered to give her gas money or buy her lunch as a gesture of gratitude. (*Id.*) When she declined that offer, he brought her breakfast and a flower instead. (*Id.* ¶¶ 46–47; DRPASF ¶ 32, Dkt. No. 90.) Arnold denies bringing her food, flowers, or other presents on any other occasion and asserts that she did not appear to be uncomfortable when he brought her breakfast. (*Id.*)

Third, Arnold (citing only his own deposition testimony and affidavit) denies threatening Anderson, the Encore employee he observed speaking with Garcia. (PRDSUF ¶¶ 49–50, Dkt. No. 83.) Arnold testified that Garcia told him that Anderson had advised her to stay away from him and that he spoke with Calip about the situation. (DSUF Ex. A-1 at 147–50, Dkt. No. 78-1.) But he denies confronting Anderson[8] and does not recall leaving work angry after his conversation with Calip. (*Id.* at 151–54.) Arnold admits that he showed up to work late the next day and did not call, but he asserts that this was a common occurrence given his long commute and that he typically did not call when he was going to be late. (*Id.* at 129–30, 154, 159–60.)[9]

---

[8] Arnold acknowledges that he had a general habit of swearing under his breath but contends that it was not directed at Anderson and that there was no indication Anderson ever heard it. (PRDSUF ¶ 51, Dkt. No. 83.) Moreover, according to Arnold, his co-workers and others on the warehouse floor were not intimidated by his swearing because he had done it for years and everyone knew that was just how he behaved. (*Id.* ¶ 52.)

[9] Arnold, however, testified that it was not a common occurrence for him to show up as late as he did on the day in question. (DSUF Ex. A-2 at 288–93, Dkt. No. 78-2.) There is a great deal of back and forth in the record regarding Arnold's tardiness and his time sheets. But because it is undisputed that tardiness—although listed as one of the reasons for Arnold's termination in VisionTek's interrogatory answers—was not in fact a basis for his discharge (*see* DRPASF ¶ 13, Dkt. No. 90), this factual dispute is of no moment.

Finally, Arnold acknowledges that he had a conversation with police at the bus stop, but he "disputes the nature of the encounter as characterized in Innes['s] email." (PRDSUF ¶ 37, Dkt. No. 83; *see also id.* ¶¶ 55–56.)

With respect to the two disciplinary warning notices he received on February 16, 2011—one related to the altercation with Anderson and one for showing up to work late and failing to call—Arnold denies that he was given any verbal warning and contends that, although his signature is present on the notices,[10] he did not have the opportunity to review or understand their contents. (*Id.* ¶¶ 53-54; *see also* DRPASF ¶ 28, Dkt. No. 90; DSUF Exs. O & P, Dkt. Nos. 78-20 & 78-21.)[11] According to Arnold, Calip did not warn him that he was required to call if he was going to be tardy. (DSUF Ex. A-2 at 160, Dkt. No. 78-2.) And Arnold testified that he does not even know what the other warning notice is about, since the only altercation he recalls is the one with the temp worker. (*Id.* at 161–62.)[12]

Concerning the political picket signs, Arnold disputes nearly all of the facts proffered by VisionTek. First, he claims that he never displayed the signs at work. (PRDSUF ¶ 26, Dkt. No. 90.) He admits that he brought the signs to and from work, but asserts that he kept them out of

---

[10] The parties disagree about whether Arnold could have signed the notices without reviewing them or even realizing what they were. But Arnold's knowledge with respect to his receipt of formal disciplinary warning notices is immaterial to whether he was discriminated against and terminated on account of his race. Therefore, the Court need not delve into the record on this point.

[11] In response, VisionTek points to deposition testimony suggesting that if an employee were to receive a disciplinary warning notice, he would be aware of it. (*See* DRPASF ¶ 26, Dkt. No. 90.) Calip testified that as a matter of custom and practice, he always spoke with an employee who was receiving a disciplinary warning notice. (*Id.*) In addition, Gipson testified that when he received a disciplinary warning notice, he had a lengthy conversation with his supervisor about the reason he was being disciplined, at the conclusion of which he was asked to sign the notice. (*Id.*)

[12] Calip confirmed in his deposition testimony that the February 16, 2011 disciplinary warning notice regarding negative verbal comments refers to Arnold's behavior towards Anderson. (DSUF Ex. G-1 at 143-44, Dkt. No. 78-10.)

sight during the work day. (*Id.*)[13] Arnold also disputes VisionTek's contention that he purposely carried the signs in a manner to attract attention; he contends that he carried the large, unwieldy signs in the most convenient fashion and immediately stored them out of sight underneath a work bench when he arrived at his work station. (*Id.* ¶ 31; DRPASF ¶ 23, Dkt. No 90.) In addition, Arnold claims that he made signs while at the warehouse on only five or six occasions and then only during his lunch break or other breaks throughout the day. (DRPASF ¶ 15, Dkt. No. 90.) He insists that he never made signs during periods that he should have been working. (*Id.*) Arnold also insists that he used only cardboard from the trash and other bits of garbage and scrap materials to make the signs. (*Id.* ¶ 16.) As to the content of the signs, as noted above, Arnold generally admits that the language was vulgar and inappropriate for the workplace. (PRDSUF ¶ 28, Dkt. No. 83.) He acknowledges making signs in support of the Occupy Wall Street movement that contained offensive language critical of bankers but disputes that any of his signs were critical of lawyers. (*Id.* ¶ 30.)

Arnold flatly rejects VisionTek's position that his sign-making had a negative impact on his productivity. (*See, e.g., id.* ¶ 32.) He denies that he was working slowly and claims that the bottlenecks referenced in his notice of employment separation were created by breakdowns in machinery or by rush orders from management that required stoppage on the regular production line. (*Id.* ¶¶ 32–33.) Indeed, Arnold claims that he was fully meeting VisionTek's expectations and that between February 2011 and the time of his termination, his behavior and work productivity were not substantially different than they had been over the prior ten years. (DRPASF ¶ 36, Dkt. No. 90; Arnold Aff. ¶ 13, Dkt. No. 84-12.) He states that he never received any oral or written warnings regarding his productivity. (PRDSUF ¶¶ 35–36, Dkt. No. 83.) And

---

[13] In his complaint, Arnold explains that due to his long commute to and from work, he could not go home after work to retrieve his signs before attending protest marches, so he brought the signs with him. (Third Am. Compl. ¶ 35, Dkt. No. 66.)

with respect to the disciplinary warning notice he received about the signs on March 26, 2012,[14] Arnold asserts that the notice—which makes no mention of reduced productivity— was for displaying signs, not making them. (*Id.* ¶ 27; DRPASF ¶ 18, Dkt. No. 90.) In addition, Arnold asserts that during his discussion with Calip regarding the signs (referenced in the notice), he was told only that he could not display political signs in the workplace. (DRPASF ¶ 17, Dkt. No. 90.) Calip did not raise any issues with respect to making signs, and he did not express any concern regarding Arnold's productivity. (*Id.*) Moreover, Arnold claims that he stopped making signs at work after the conversation with Calip in March 2012. (PRDSUF ¶¶ 27, 31, Dkt. No. 83.) He contends that shortly thereafter, he stopped bringing signs to the workplace entirely. (DRPASF ¶ 24, Dkt. No. 90.) In the interim—while he was still bringing signs to work but was not making them during the work day—the signs were not visible to other employees. (DSUF Ex. A-2 at 179, Dkt. No. 78-2.)

Arnold also denies that there was any friction between him and the other members of the production team. (PRDSUF ¶¶ 32, 34, Dkt. No. 83.) In support, he asserts that (1) he had minimal workplace interaction with Amin because they did different jobs and were far away from each other on the warehouse floor; (2) Mangosing, who worked with Arnold on occasion, was able to work with him and never had to stay late because of him; (3) Gipson worked in the production area; and (4) Arnold's behavior, including his cursing, did not affect the production team's work. (*Id.* ¶¶ 32–34.)

The deposition testimony of Arnold's co-workers, however, refutes those assertions. For example, Mangosing testified that Arnold's sign-making made Arnold a less productive worker,

---

[14] Arnold contends that he was not presented with a copy of the March 26, 2012 disciplinary warning notice and was not informed that it was being placed in his file. (PRDSUF ¶ 27, Dkt. No. 83.) Unlike the two February 2011 disciplinary warning notices, the March 2012 notice is not signed by Arnold. (*Id.*; *see also* DSUF Exs. O, P, Q, Dkt. Nos. 78-20, 78-21, 78-22.) Calip testified that Arnold refused to sign it. (DSUF Ex. G-2 at 164, Dkt. No. 78-11.)

which annoyed Mangosing because it created more work for him. (DSUF Ex. I at 111-13, Dkt. No. 78-14.) Mangosing also testified that because Arnold was working slowly, he had no choice but to help him, which he felt was unfair. (*Id.* at 88, 90, 95.) In addition, Arnold's swearing affected Mangosing's concentration; Mangosing said that he is now a more productive worker without Arnold there. (*Id.* at 110–11.) Gipson testified that although he was used to Arnold's cursing, which got worse starting at the end of 2011, it made others feel uncomfortable. (DSUF Ex. H-2 at 129–36, Dkt. No. 78-13.) He further testified that while Arnold's cursing did not affect his ability to work with people who knew him, it did affect his ability to do his job. (*Id.* at 132–37.) Gipson also confirmed that Arnold distanced himself from the rest of the production team and became a less productive worker, which caused bottlenecks and forced the other members of the team to pick up the slack. (*Id.* at 163–64, 181.)

Despite his insistence that the signs did not affect his productivity or cause any friction with his co-workers, Arnold testified that in hindsight, he does not think it was appropriate to bring politically motivated signs to the workplace. (DSUF Ex. A-1 at 63–64, Dkt. No. 78-1; DSUF Ex. A-2 at 175–77, Dkt. No. 78-2.) He said that in the future, he would consider doing so to be a mistake. (*Id.*) Arnold also acknowledged that no other VisionTek employees brought signs to work. (DSUF Ex. A-2 at 172, Dkt. No. 78-2.) In addition, he believes he was terminated because of his protest activities. (*Id.* at 210.) When asked at his deposition if he thinks he was terminated because he is black, Arnold responded, "Yes, I do think that, too . . . Because I [was] doing something they [did] not like [*i.e.*, protesting]. I am an easy target . . . [because] I am black." (*Id.* at 210–11.)

According to VisionTek, Arnold actually received preferential treatment. Calip testified that he "never really wanted to put anything in [Arnold's] file because he[] had a history as being

a good guy with [VisionTek]." (DSUF Ex. G-2 at 162, Dkt. No. 78-11.) Calip also said that he

was lenient with Arnold despite his inefficiency because he did not want Arnold to lose his job,

particularly given his history with the company. (*Id.* at 177.) Indeed, rather than see Arnold lose

his job, Calip put him in a production position that did not impact the daily output of orders, gave

him fewer orders, and assigned him jobs that did not require him to work with other employees.

(*Id.* at 178–79.) During his deposition, Innes stated, "we give people second chances, and I think

[Arnold] has probably got about 20 chances." (DSUF Ex. D-2 at 159, Dkt. No. 78-6.)

## DISCUSSION

Summary judgment is proper when "there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When presented with

a summary judgment motion, "[t]he court has one task and one task only: to decide, based on the

evidence of record, whether there is any material dispute of fact that requires a trial." *Payne v.

Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918,

920 (7th Cir. 1994)). "[A] factual dispute is genuine only if a reasonable jury could find for either

party." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010) (internal quotation

marks omitted). "Further, disputed facts that are not outcome-determinative are not material and

will not preclude summary judgment." *Id.*

"In evaluating whether a genuine issue of material fact exists, all evidence and inferences

must be viewed in the light most favorable to the nonmoving party." *Scott v. Edinburg*, 346 F.3d

752, 755 (7th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) and

*Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003)).

"[A] court may not assess the credibility of witnesses,[15] choose between competing inferences or

---

[15] Because evaluations of witness credibility are inappropriate at the summary judgment stage, the Court
will not address Arnold's argument that Calip's testimony lacks credibility because of a past criminal

balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255). However, before the non-moving party "can benefit from a favorable view of the evidence, he must first actually place evidence before the court[]." *Montgomery*, 626 F.3d at 389. "He must 'make a showing sufficient to establish any essential element of [his] cause of action for which [he] will bear the burden of persuasion at trial.'" *Id.* (quoting *Smith ex rel. v. Severn,* 129 F.3d 419, 425 (7th Cir. 1997)). The Seventh Circuit has held that "uncorroborated, self-serving testimony, '[i]f based on personal knowledge or firsthand experience,' may prevent summary judgment against the non-moving party, as 'such testimony can be evidence of disputed material facts.'" *Id.* (quoting *Berry v. Chi. Transit Auth.,* 618 F.3d 688, 691 (7th Cir. 2010)). "But mere conclusory allegations do not constitute evidence." *Id.*

## I.    Arnold's Title VII Claims

Counts III and IV of Arnold's third amended complaint assert claims brought pursuant to Title VII for employment discrimination in the form of a hostile work environment and unlawful retaliation. It is undisputed that Arnold's Title VII claims are barred due to his failure to file suit within 90 days of receiving right-to-sue letters from the U.S. Equal Employment Opportunity Commission ("EEOC"). (*See* PRDSUF ¶¶ 79–80, Dkt. No. 83; Pl.'s Resp. Br. in Opp'n to Def.'s Mot. for Summ. J. at 1, Dkt. No. 84.) Following his termination from VisionTek, Arnold filed two charges of discrimination with the EEOC. (PRDSUF ¶ 79, Dkt. No. 83.) He filed his first charge, alleging only retaliation, on September 26, 2012. (*Id.*) The EEOC sent Arnold a right-to-sue letter with respect to that charge on September 27, 2012. (*Id.*) Arnold's second charge, alleging both

---

conviction. Nor will the Court consider VisionTek's assertions regarding Arnold's credibility based on certain statements made during, and inconsistencies in, his deposition testimony.

retaliation and discrimination, was filed on October 18, 2012. (*Id.*) On October 22, 2012, the

EEOC sent Arnold a right-to-sue letter for the second charge. (*Id.*) Arnold had 90 days from

receipt of the right-to-sue letters to file suit. *See* 42 U.S.C. § 2000e-5(f)(1). He concedes that he

received both letters before October 26, 2012, and that he failed to file suit within 90 days of

receipt. (PRDSUF ¶ 80, Dkt. No. 83.) Because Arnold concedes that his Title VII claims are

untimely, summary judgment is granted in VisionTek's favor as to Counts III and IV.

## II.     Arnold's § 1981 Hostile Work Environment Claim

In Count I of his complaint, Arnold claims he was subjected to a hostile work environment

due to harassment on the basis of his race in violation of § 1981. To preclude summary judgment

on his § 1981 hostile work environment claim, which is analyzed in the same manner as a hostile

work environment claim brought under Title VII, Arnold must present sufficient evidence to

create a material issue of fact as to the following four elements: (1) the work environment must

have been both subjectively and objectively offensive; (2) his race must have been the cause of

the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis

for employer liability. *See Montgomery*, 626 F.3d at 390.

A plaintiff may satisfy the fourth element by proving either that a supervisor participated

in the harassment that created the hostile work environment or that the employer was negligent in

discovering or remedying harassment by co-workers. *See id.* Because Arnold claims that his

supervisor, Calip, created the alleged hostile work environment, the fourth element is not at issue

here. The Court will thus proceed to assess each of the three remaining elements in turn. As an

initial matter, however, it should be noted that both parties analyze Arnold's racial discrimination

claim in their briefing as a disparate treatment or unlawful discharge claim, as opposed to a hostile

work environment claim. Indeed, VisionTek analyzes Arnold's discrimination and retaliation

claims together, essentially treating them as one claim. But because it is clear on the face of Arnold's complaint that Count I has been brought as a hostile work environment claim, the Court will analyze it as such. In any case, the parties' treatment of Arnold's hostile work environment claim as one for disparate treatment or unlawful termination is inconsequential because, as discussed below, Arnold has failed to produce sufficient evidence that he was treated differently or terminated on account of his race.

To satisfy the first element of a hostile work environment claim, the plaintiff must show that his work environment "was both objectively and subjectively offensive—that is, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 647 (7th Cir. 2011) (internal quotation marks omitted). "Under the objective hostility analysis, courts may consider: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether it [was] physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interfere[d] with the employee's ability to complete his or her assigned duties." *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 271 (7th Cir. 2004) (internal quotation marks omitted). With respect to the third element, the harassment must have been severe or pervasive enough to alter the terms and conditions of employment. *Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 851 (7th Cir. 2007). Put differently, it must have been sufficiently severe or pervasive to interfere with the employee's ability to perform his assigned duties. *Dandy*, 388 F.3d at 271. Even if Arnold's allegations of harassment were supported by the record, they do not rise to the level of a hostile work environment as defined above.

The Court will assume for present purposes that Arnold found Calip's conduct offensive. The question is therefore whether a reasonable person would view that conduct as creating a

hostile or abusive work environment. Arnold claims that Calip created a hostile work environment by (1) forcing him to use the back door of VisionTek's facility, thereby singling him out from his co-workers and causing him to feel demeaned and humiliated; (2) giving him impossible tasks and then chastising, orally reprimanding, and humiliating him for failing to complete them; and (3) threatening him with unwarranted disciplinary action and threatening to keep a secret file on him. This alleged conduct is not physically threatening or humiliating. Nor is there any evidence that it interfered with Arnold's ability to do his job. Indeed, Arnold fails to point to even "a mere offensive utterance" made by Calip.

The Seventh Circuit has made clear that neither normal workplace friction nor general unhappiness at work rises to the level of actionable harassment and that the allegedly harassing conduct must be truly reprehensible to defeat summary judgment. *See, e.g., Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014) (affirming summary judgment for the defendant on plaintiffs' hostile work environment claim because the evidence was insufficient to show a workplace permeated with discriminatory ridicule, intimidation, and insult); *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004) (affirming summary judgment for the defendant in part because the plaintiff's complaints about transfers, a late overtime payment, salary, and difficulties with managers did not constitute actionable harassment, only normal workplace friction); *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002) (affirming summary judgment for the defendants and noting that many employees have to put up with some amount of rude, arrogant, or boorish behavior at work). Arnold has not presented any evidence that distinguishes his case from those cited above—*i.e.*, there is no objective evidence that Arnold's work environment at VisionTek was "permeated with discriminatory ridicule, intimidation, and insult." *Alexander*, 739 F.3d at 982.

Even more problematic for Arnold is the second element of a hostile work environment claim, as there is no evidence suggesting that Calip's purported harassment of Arnold was on account of Arnold's race. Calip did not make any statements regarding Arnold's race or use any racially-charged language, and there is not enough in the record from which one could infer that his behavior towards Arnold was racially motivated. "Although the complained-of conduct need not be explicitly racial, a plaintiff must show that the conduct has a racial character or purpose." *Lilly v. Roadway Express, Inc.*, 6 F. App'x 358, 359 (7th Cir. 2001) (citing *Hardin v. S.C. Johnson & Son, Inc.,* 167 F.3d 340, 345 (7th Cir.1999)). Assuming that Calip forced Arnold to use the back door, there is nothing in the record to suggest that he did so because Arnold is black, rather than because he was carrying political protest signs containing vulgar language to and from the warehouse. Similarly, even assuming that Calip gave Arnold "impossible tasks" and then berated him for failing to complete them, there is no evidence that Arnold was singled out for those tasks on account of his race or that the reprimands reflected racial animus. In fact, the only evidence in the record on this point suggests that Calip gave Arnold easier tasks (or less work) than his co-workers due to his inefficiency and that bottlenecks and rush orders were experienced equally by the other members of the production team. Finally, again assuming that Arnold's conclusory allegations are true, there is nothing in the record from which a jury could infer that Calip's threats of disciplinary action and keeping a "secret" file on Arnold were attributable to Arnold's race, as opposed to his disruptive behavior and lack of productivity.

The Seventh Circuit has made clear that in order to survive summary judgment, the evidence presented by the plaintiff must be sufficient to establish a connection between the behavior of which he complains and his race. *See, e.g., Lockhart v. St. Bernard Hosp.*, 538 F. App'x 720, 721 (7th Cir. 2013); *see also Whigum v. Keller Crescent Co.*, 260 F. App'x 910, 914

(7th Cir. 2008) (holding that the plaintiff's hostile work environment claim lacked merit because he offered nothing to establish that his manager was motivated by race, and noting that "[n]ot every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority") (quoting *Beamon v. Marshall & Ilsley Tr. Co.,* 411 F.3d 854, 863 (7th Cir. 2005)).[16] While Arnold's problems at work may have been unique to him, he has not pointed to any evidence from which a jury could conclude that those problems were unique to him because of his race. *See Herron*, 388 F.3d at 302–03 (affirming the district court's grant of summary judgment upon finding the plaintiff's suggestion that his problems at work were race-related because white employees did not have the same problems to be unsupported by the record).

In sum, a reasonable jury could not conclude from Arnold's unsupported allegations that he was subjected to a hostile work environment. Even if his allegations regarding Calip's behavior were considered evidence of harassment, there is no indication in the record that Calip's conduct was racially motivated. Summary judgment is therefore granted as to Count I.

### III.    Arnold's § 1981 Retaliation Claim

In Count II of his complaint, Arnold claims that VisionTek violated § 1981 by terminating him in retaliation for his complaints of discrimination. "Unlawful retaliation occurs when an employer takes an adverse employment action against an employee for opposing impermissible discrimination." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011) (quoting *Rogers v. City of Chi.*, 320 F.3d 748, 753 (7th Cir. 2003)). Arnold asserts that he opposed impermissible discrimination on two occasions: in March 2012, when he claimed Calip was violating his civil rights, and in July 2012, when he told Calip, "you wouldn't be doing this to me

---

[16] Both *Lockhart* and *Whigum* are unpublished Seventh Circuit orders issued after January 1, 2007. Although not precedential, the orders provide useful points of comparison here. *See* Fed. R. App. P. 32.1(a); 7th Cir. R. 32.1(b).

if I wasn't black." It is undisputed—and documented in the March 26, 2012 disciplinary warning notice—that Arnold made the former complaint. As discussed above, however, the parties disagree about whether the July 2012 statement was made. Arnold's only support for the claim that he made the statement is his own deposition testimony. For purposes of the present motion, the Court accepts Arnold's version of events and assumes it is sufficient to establish a dispute of fact. *See O'Leary*, 657 F.3d at 632.

To overcome a motion for summary judgment on a § 1981 retaliation claim—the *prima facie* requirements for which are the same as for a Title VII retaliation claim—a plaintiff may proceed under either the direct or indirect method of proof. *See Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 403–04 (7th Cir. 2007); *see also Alexander*, 739 F.3d at 983 ("Like a discrimination claim, a claim of retaliation may be established through the direct or indirect method of proof."). Under the direct method, a plaintiff must present evidence of (1) a statutorily-protected activity, (2) a materially adverse action taken by the employer, and (3) a causal connection between the two. *Humphries*, 474 F.3d at 404.

To satisfy the first element, Arnold must present evidence that "he took some step in opposition to a form of discrimination that the statute prohibits." *O'Leary*, 657 F.3d at 631. He "need not show that the practice he opposed was in fact a violation of the statute . . . However, his opposition must [have been] based on a good-faith and reasonable belief that he [was] opposing unlawful conduct." *Id.* If Arnold did "not honestly believe he [was] opposing a practice prohibited by the statute, or if his belief [was] objectively unreasonable, then his opposition is not protected by the statute." *Id.* (internal citations omitted). For present purposes, the Court will assume that Arnold's complaints constitute statutorily-protected activity. With respect to the second element,

there is no question that termination is a materially adverse employment action. *See, e.g., Pantoja*, 495 F.3d at 849; *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 889 (7th Cir. 2016).

What remains to be decided, then, is whether Arnold has presented sufficient evidence from which a jury could conclude that there was a causal connection between his complaints of discrimination and his termination. A causal connection may be shown through direct evidence— which would entail something akin to an admission by the employer—or through a "convincing mosaic" of circumstantial evidence that would permit the same inference without the employer's admission. *O'Leary*, 657 F.3d at 630. The Seventh Circuit has recognized three categories of circumstantial evidence available to a plaintiff taking the "convincing mosaic" approach. *Coleman*, 667 F.3d at 860. One includes suspicious timing, ambiguous statements, and other bits and pieces from which an inference of retaliatory intent might be drawn. *Id.* Another is evidence that similarly-situated employees were treated differently. *Id.* Third is evidence that the employer offered pretextual reasons for the adverse employment action. *Id.*

According to VisionTek, Arnold was terminated for making political protest signs that contained vulgar language inappropriate for the workplace during the workday when he should have been working, which made him less productive, created friction with his co-workers, and caused bottlenecks on the production line. In response, Arnold contends that he has presented a "convincing mosaic" of circumstantial evidence that VisionTek did not terminate him for the stated reasons but instead fired him in retaliation for his complaints of racial discrimination. But to show pretext, a plaintiff "must provide evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge." *Logan v. Kautex Textron N. Am.*, 259 F.3d 635, 640

(7th Cir. 2001) (internal quotation marks omitted). And Arnold has failed present any such evidence here.

Despite Arnold's suggestion to the contrary, the mere fact that VisionTek has proffered multiple reasons for Arnold's discharge does not mean that those reasons are inconsistent or that they were not the actual reasons. VisionTek has essentially offered two justifications for Arnold's termination: disruptive behavior and poor performance. The two proffered rationales are not at odds with one another. Indeed, disruptive behavior often goes hand-in-hand with or results in poor performance. The other proffered reasons for his discharge that Arnold describes as indicating pretext—the incident with Anderson, displaying and making signs, and bottlenecks—are not really separate reasons at all but rather examples of the purported disruptive behavior and poor performance.

Moreover, VisionTek's failure to cite certain examples of Arnold's problematic behavior in his notice of employment separation does not indicate that those examples were retroactively concocted. In fact, those examples are documented elsewhere in Arnold's personnel file and have support in the record. In addition, the March 26, 2012 disciplinary warning notice's focus on displaying signs as opposed to making them does not necessarily lead to the conclusion that Arnold's sign-making was not considered problematic by VisionTek. The March 2012 notice was issued in response to a specific incident in which Innes observed one of Arnold's signs in the warehouse and brought it to Calip's attention. (*See* DSUF Ex. G-2 at 191–93, Dkt. No. 78-11.) When asked what it was about that particular sign that warranted a disciplinary warning notice, Calip said that the sign contained vulgar language. (*Id.* at 198–99.) That explains why the notice was specifically geared toward displaying signs and did not mention sign-making, and accordingly why Arnold's argument that the omission reveals an inherent inconsistency in

VisionTek's position fails. In addition, Arnold's co-workers testified that his sign-making during working hours caused problems, which further undermines his claim of pretext. For example, Gipson testified that Calip warned Arnold numerous times about making signs on company time. (*See* DSUF Ex. H-2 at 126, Dkt. No. 78-13.)

Arnold also argues that the gap between his receipt of the March 26, 2012 disciplinary warning notice (at which point he supposedly stopped making signs) and his termination shows that the sign-making rationale for his termination is mere pretext.[17] However, the only support for Arnold's assertion that he stopped making signs is his own deposition testimony. Meanwhile, Gipson testified that Arnold was bringing signs or making signs at work from the time he started protesting up until his termination. (*See id.* at 127.) Mangosing similarly testified that Arnold continued making signs during working hours until he was terminated in August 2012. (*See* DSUF Ex. I at 115, Dkt. No. 78-14.) And Calip said that while the signs were less noticeable, Arnold continued making them after he received the March 26, 2012 disciplinary warning notice. (*See* DSUF Ex. G-2 at 200, 222, Dkt. No. 78-11.) In addition, while Arnold claims that he stopped making signs after the March 2012 incident and shortly thereafter ceased bringing signs to work entirely, he also testified that it was possible he was still bringing signs in July 2012 (*i.e.*, shortly before he was terminated). (*See* DSUF Ex. A-2 at 201-203, Dkt. No. 78-2.) In sum, the record suggests that Arnold's "sign activity" continued up until his termination. Even if Arnold stopped

---

[17] In his complaint, Arnold alleges that he was fired approximately two weeks after he told Calip "you wouldn't be doing this to me if I wasn't black." (Third Am. Compl. ¶¶ 43-44, 57-58, Dkt. No. 66.) But in both his response brief and his affidavit, Arnold asserts that he was terminated approximately one month after he made that statement. (Pl.'s Resp. Br. in Opp'n to Def.'s Mot. for Summ. J. at 12, Dkt. No. 84; Arnold Aff. ¶ 18, Dkt. No. 84-12.) At this stage in the litigation, the Court looks to the evidence on record (as opposed to the allegations in the complaint) and thus assumes that there was a temporal gap of one month.

making signs over four months prior to his termination, sign-making is only one of the ways in which he was being disruptive and only one of the contributing factors to his poor performance.

In addition, the mere fact that Arnold did not receive any disciplinary warning notices for poor performance does not mean that poor performance is merely a post-hoc rationalization for his termination. Indeed, the record reflects that Arnold's productivity was an issue and that Calip worked with him to address the issue rather than write him up. Arnold's co-workers consistently testified that he was working slowly and that they had to pick up his slack, which bred resentment. Arnold's conclusory denials on that point do not suffice to create a genuine issue of material fact as to whether VisionTek's explanations are lies. *See O'Leary*, 657 F.3d at 635 ("Where, as here, the employer contends that the plaintiff's job performance was wanting, the plaintiff must do more than dispute the validity of the employer's criticisms."); *see also Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 896–97 (7th Cir. 2015) (affirming summary judgment for the defendant and, in holding that plaintiff's inability to show he was meeting his employer's legitimate expectations was fatal to his discrimination claim, noting that plaintiff's own opinion about his work performance was irrelevant). Even if the production bottlenecks were solely a result of rush orders, and never Arnold's slow pace, that would not indicate that his performance was otherwise adequate. Nor would VisionTek's incorrect belief that he was causing the bottlenecks establish pretext. *See Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 311 (7th Cir. 2012) (the question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed that reason; it is not the court's concern that an employer may be wrong about its employee's performance).

Arnold also has failed to present any evidence indicating that his disruptive behavior and poor performance, if true, were insufficient to motivate or did not actually motivate his

termination. There is nothing in the record to suggest that something besides those reasons—let alone Arnold's race or his complaints of what he felt to be racial discrimination—was the motivating factor in his discharge. In fact, Arnold initially testified that he "believe[s] [he] was wrongfully terminated because of [his] protest activities." (DSUF Ex. A-2 at 210–11, Dkt. No. 78-2.) He then clarified that he also thinks he was terminated because he is black. (*Id.*) He explained that he was doing something VisionTek did not like—*i.e.*, protesting—and his race makes him "an easy target." (*Id.*) But "[i]n order to prove causation, the plaintiff must demonstrate that the employer would not have taken the adverse action but for the protected expression." *Cullom v. Brown*, 209 F.3d 1035, 1040 (7th Cir. 2000) (internal quotation marks omitted). Far from producing evidence that might support such a conclusion, Arnold acknowledges that he was fired, at least in part, on account of his admittedly inappropriate protest signs.

Arnold's arguments regarding VisionTek's purportedly ambiguous statements and suspicious timing fare no better. While the stated reasons for Arnold's termination that he "fail[ed] to be a team member" and "caus[ed] friction" are subjective and not particularly precise, the record makes their meaning clear. And Arnold has not presented any evidence that VisionTek made those purportedly ambiguous statements to hide a discriminatory or retaliatory motive. *See Logan*, 259 F.3d at 640–41 ("We recognize that labeling an employee as having an 'attitude' can be a camouflage for race discrimination in certain cases, but [the plaintiff] has failed to point to any objective evidence that this subjective evaluation was a mask for discrimination.") (internal citation omitted).

With respect to the purportedly suspicious timing of his termination, "temporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient to show that the former caused the latter." *O'Leary*, 657 F.3d at 635l; *see also Leitgen v. Franciscan*

*Skemp Healthcare, Inc.*, 630 F.3d 668, 675 (7th Cir. 2011) ("As we have often observed, suspicious timing alone is almost always insufficient to survive summary judgment."). Arnold acknowledges as much but goes on to claim that "temporal proximity is one among several tiles in [his] evidentiary mosaic depicting retaliatory motive." (Pl.'s Resp. Br. in Opp'n to Def.'s Mot. for Summ. J. at 12, Dkt. No. 84 (quoting *Coleman*, 667 F.3d at 860).) For the reasons discussed above, however, purportedly suspicious timing is the only tile left in Arnold's mosaic.

The Seventh Circuit has rejected a bright-line rule with respect to the interval of time between protected activity and claimed retaliation that is necessary for an inference of causation. *See Coleman*, 667 F.3d at 861. *See Benuzzi v. Bd. of Educ. of City of Chi.*, 647 F.3d 652, 665-66 (7th Cir. 2011) (noting that adverse actions occasionally come so close on the heels of a protected act that an inference of causation is sensible and citing cases holding that such an inference was reasonable where the employee was discharged immediately after, or within two to three days of, the protected activity); *see also Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) ("The approximate seven-week interval between [the plaintiff's] sexual harassment complaint and her subsequent arrest/termination does not represent that rare case where suspicious timing, without more, will carry the day."). Within the month-long gap here, any number of intervening events might reasonably have justified Calip's termination decision, particularly given the evidence of Arnold's pattern of bad behavior and increasingly poor performance. *See Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 675 (7th Cir. 2011) (proximity of events does not imply causation where there is a significant intervening event separating an employee's complaints from his discharge); *see also Hall v. Bodine Elec. Co.*, 276 F.3d 345, 359 (7th Cir. 2002) ("[A]n employee's complaint of harassment does not immunize her from being subsequently disciplined or terminated for inappropriate workplace behavior.") (overruled on

other grounds). Moreover, Arnold complained months earlier that Calip was violating his civil rights, with no reported repercussions. Without some corroborating evidence of a causal connection, the timing of Arnold's termination relative to his discrimination complaints is not enough to suggest retaliation in the circumstances of this case.

Arnold has thus failed to point to any evidence that would support a causal connection between his complaints of discrimination and his termination. There is no direct evidence of such a connection, and the unsubstantiated circumstantial evidence offered by Arnold does not provide a sufficient basis from which a reasonable jury could infer one. Nor has Arnold presented any evidence that a similarly-situated employee who did not oppose discrimination received better treatment than he did. With no evidence of causation, Arnold cannot establish a *prima facie* case of retaliation under the direct method of proof.

## IV. Arnold's § 1981 Discriminatory Discharge Claim

Arnold does not argue that he can establish a *prima facie* case of retaliation under the indirect method of proof—likely because he has not identified any similarly-situated employee. In his response brief, however, he attempts to recast his § 1981 discrimination claim as a discriminatory discharge claim—as opposed to a hostile work environment claim—and argues that he has made out a *prima facie* case of discrimination under the indirect method. A plaintiff generally is not permitted to add claims through arguments made in opposing summary judgment. *See, e.g., Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002); *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 412 (7th Cir. 2009). But even considering Arnold's claim of discriminatory discharge on its merits, VisionTek is entitled to summary judgment.

To establish a *prima facie* case of discriminatory discharge under the indirect method of proof, a plaintiff must show that (1) he is a member of a protected class; (2) his job performance

met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly-situated persons outside the protected class received more favorable treatment. *Burnell v. Gates Rubber Co.*, 647 F.3d 704, 709 (7th Cir. 2011). If the plaintiff establishes a *prima facie* case, the defendant must give a legitimate reason for the discharge, at which point the plaintiff must produce evidence that the defendant's proffered reason is actually pretext for racial discrimination. *Id.*

Arnold contends that summary judgment is improper because there are material issues of fact with respect to whether he met VisionTek's legitimate expectations and whether he was treated differently than similarly-situated individuals. On the first point, Arnold asserts that there is a question of fact because there is circumstantial evidence that VisionTek's reasons for terminating him are false. The Court has already rejected that argument above. *See Collins v. Am. Red Cross*, 715 F.3d 994, 1000 (7th Cir. 2013) (where an employer has cited performance issues as the justification for its adverse action, the performance element of the *prima facie* case cannot be separated from the pretext inquiry). Moreover, as noted above, Arnold's conclusory statements regarding his own performance—for example, that he was not working slowly—do not create a material issue of fact. *See Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 740 (7th Cir. 2006) (noting that a plaintiff's conclusory statements do not create an issue of fact; an employee's self-serving statements about his ability are thus insufficient to contradict an employer's negative assessment of that ability).

On the second point, Arnold asserts that Mangosing, one of Arnold's non-black production teammates who performed duties similar to his own, was not mistreated by Calip. According to Arnold, given the evidence of pretext and the fact that non-black co-workers received better treatment, a reasonable jury could conclude that Calip harassed him on account of

his race. But again, the Court has found Arnold's claims of pretext to be wholly unsubstantiated. And there is no indication that Mangosing was treated any differently than the other members of the production team. Even accepting Arnold's version of events, it appears that all of his team members received better treatment than he did, including Gipson, who is also black. Indeed, Arnold admits that the only difference between him and the other black employees in the warehouse is that he was participating in political movements. (*See* DSUF Ex. A-2 at 284, Dkt. No. 78-2.) To survive summary judgment using the indirect method of proof, Arnold would need to show that a non-black employee with comparable disciplinary or performance issues did not face termination. *See, e.g., Kriescher v. Fox Hills Golf Resort & Conference Ctr.*, 384 F.3d 912, 916 (7th Cir. 2004). There is no such evidence in the record. And even if there were, the burden-shifting analysis ultimately comes down to the question of pretext. Arnold's failure to present sufficient evidence of pretext dooms his § 1981 claim, whether it is cast as a claim for unlawful retaliation or discriminatory discharge.

## CONCLUSION

For the reasons stated above, VisionTek's motion for summary judgment (Dkt. No. 77) is granted. The Clerk of Court is directed to enter Judgment in favor of Defendant Visiontek Products, Inc.

ENTERED:

Dated:  July 17, 2017

_____
Andrea R. Wood
United States District Judge